[Civ. No. 19088. First Dist., Div. One. June 17, 1960.]

JUNE I. BURNIGHT, Petitioner, v. INDUSTRIAL ACCI-
DENT COMMISSION et al., Respondents.

William A. White and Edward A. Barry for Petitioner.

Everett A. Corten, Emily B. Johnson and Hanna & Brophy for Respondents.

Stanley Mosk, Attorney General, Edward M. Belasco and Norman L. Epstein, Deputy Attorneys General, Edmund D. Leonard, T. Groezinger and Loton Wells as Amici Curiae on behalf of Respondents.

BRAY, P. J.—Petitioner seeks to review an order of the respondent commission made after reconsideration, annulling an award to her of a death benefit in the sum of $10,000.

## QUESTION PRESENTED

Was there any substantial evidence that the suicide of petitioner's husband was not proximately caused by the industrial injury suffered by him?

## RECORD

Decedent was employed by W. P. Fuller and Company as a paint chemist from 1935 until his death in September, 1957, except for two periods of military service in 1942 to 1946 and 1951 to 1952. In 1951 he was a patient in a service hospital for about three months, suffering from what was diagnosed as manic depressive psychosis with schizophrenic and paranoid tendencies. The hospital records state that this illness was not a result of or aggravated by his service. He received a medical discharge.

In June, 1957, he was sent by his employer to Ensenada, Mexico, to supervise the conversion of a recently acquired paint plant. While there he experienced many difficulties and

frustrations. He spoke no Spanish and had to transact business through an interpreter. He worked long hours, ate at irregular hours, had difficulty working out paint formulas and having them ready for production by the Mexican management; he was unfamiliar with certain purchasing, installation and administrative duties assigned to him, and worried about his ability to handle them and about his expense account. He worked against a deadline. Worrying about all these he began to experience difficulty in sleeping, was unduly tired, had night sweats, palpitations and stomach upsets. He had difficulty "making up his mind about anything." About September 1 he visited a psychiatrist in Los Angeles who gave him medication and advised rest. About September 6 he "blacked out" and was attended in his motel room by his employer's doctor, Doctor Trevino. September 9 he was hospitalized in Ensenada where he remained until September 14. Doctor Trevino felt at first that his condition was caused by overwork and malnutrition, but on closer examination concluded that decedent was in an abnormal condition, "something like" schizophrenia, and advised that he be sent to a psychiatrist. Doctor Trevino stated that his opinion had no merit before that of a psychiatrist and that he could not diagnose decedent's symptoms accurately. Decedent returned to San Francisco and was admitted to St. Francis Hospital September 18, 1957. He was discharged September 21. Doctor Whitsell who attended him wrote that his "diagnostic impression was (1) acute anxiety reaction with depressive and schizoid features, and (2) encephalopathy due to Vitamin B deficiency." After discharge from the hospital he was referred to Doctor Hamilton, a psychiatrist, who saw him September 24. On September 27, decedent and his wife got up late. He seemed somewhat shaky but talked rationally. He helped arrange furniture in the apartment. He shaved as usual with an electric razor. About noon he left, stating that he was going to see Doctor Hamilton but if he had time might take a therapy treatment first.

About 12:15 p. m. he registered at a small, cheap hotel on Sixth Street, stating that he would be there "just tonight." His signature on the registration sheet was written in a scrawl so that the clerk had to ask how it was spelled. He gave a fictitious Los Angeles address as his residence. The next morning he was found dead, sitting in the bathtub which was half full of bloody water. The radial artery of his right wrist was severed. A single-edge razor blade lay on the

bottom of the tub under his right thigh. A blade wrapper was nearby on a shelf. On the bedroom dresser was an open package of single-edge razor blades. He left no note.

Petitioner, the widow, filed an application for compensation benefits. After hearings the referee found that decedent "was subjected to stress situations arising out of and occurring in the course of his employment which precipitated the nervous breakdown and manic depressive psychosis on September 6, 1957, and said injury proximately caused the death of said employee by suicide" and awarded petitioner a burial allowance, medical reimbursement, attorneys' fees and a death benefit of $10,000. On reconsideration, the commission annulled the referee's findings and award, found that decedent for several months prior to September 6, 1957, "was subjected to stress situations arising out of and occurring in the course of his employment which precipitated his nervous breakdown and manic depressive psychosis on September 6, 1957." The commission further found: "The death of said employee by suicide on September 27, 1958 [*sic*], was not proximately caused by the injury herein." It then awarded petitioner only medical reimbursement and a modified attorneys' fee.

WAS THE EMPLOYEE'S SUICIDE THE PROXIMATE RESULT OF THE INDUSTRIAL INJURY?

Under well established rules our task is to determine whether there is any substantial evidence that it was not, for if there is any such evidence we are bound by the commission's findings. There was testimony that prior to his assignment to Mexico decedent was a gregarious individual and a "normal human being." There is ample evidence (in fact, none to the contrary) that, as found by the commission, decedent's "nervous breakdown and manic depressive psychosis" was precipitated by and in the course of his employment. The finding on this subject is not contested.

This brings us to the evidence concerning the suicide. Doctor Whitsell reported: "It is my opinion that his suicide occurred as a result of a mental illness which was precipitated by the unusual stress associated with the work to which he was assigned in Mexico." Doctor Finley, a psychiatrist on whose testimony apparently the commission made its finding that decedent's suicide was a voluntary act, testified: "Oh, I believe he carried this out [the suicide] on a volitional basis, because he was depressed and *this is one of the concerns we have for this type of patient, that they will plan to take their*

*own lives.''* (Emphasis added.) The doctor gave as his reasons for thinking decedent's suicide was a voluntary act decedent's actions in registering at the hotel, purchasing razor blades when ordinarily he used an electric razor, and that "this was something that had been planned over a period of probably several hours, I believe in a condition which the patient suffers in being depressed." The doctor felt that decedent was aware of the purpose of his act, had the mental capacity to and did realize its consequences, and did it intending to terminate his life. Doctor Finley opined that decedent was suffering from a "manic depressive disorder" and seriously doubted that decedent's work in Mexico played any part in its development, pointing out that he had a similar illness in 1951; that while at Letterman Hospital it appeared that decedent had other stresses, "personal problems in his family life, care of a polio brother, attention to his father that went on for sometime." While the witness did not have an opinion as to what caused decedent's manic depressive condition, he was positive that it was not due to the fatigue and long hours of work connected with decedent's employment. He flatly disagreed with Doctor Whitsell's opinion. While the commission went along with Doctor Finley's opinion on the suicide question, it found against him on his conclusion that decedent's manic depressive condition was not due to industrial injury.

Were this a civil action for damages, the joining together of the commission's finding that decedent's manic depressive condition was caused by his employment with the testimony of Doctor Whitsell that the suicide was the result of the overwork, and Doctor Finley's testimony that suicide is one of the results of such a condition for which the doctors have to look out, a court would be compelled to find that the industrial injury was at least a contributing factor in decedent's death, even though, as opined by Doctor Finley, decedent's act in taking his own life was a voluntary one, in the sense that he committed it with full knowledge of what he was doing.

Recently this court, in *Tate* v. *Canonica,* 180 Cal.App.2d 898 [5 Cal.Rptr. 28], dealt with the question of liability for suicide resulting from a civil injury. There we pointed out that originally in this country the rule in civil actions was that there could be no liability for a negligent act causing a mental condition resulting in suicide, regardless of whether the one taking his own life was sane or insane. Later the rule was changed so that if the suicide was committed

while the person committing it was insane or in a frenzy, liability would attach to the person causing that condition, but would not attach were the suicide's mental condition less than insanity or frenzy. The main reason for these rules was that the act of suicide, if committed when the person doing it had sufficient mental condition to know what he was doing, was considered to be an independent intervening cause, and to be wilfully inflicted. We then set forth that in some jurisdictions the rule now being applied, and the one which should be applied in California (and the more realistic rule), is that where the injured person has a condition of insanity resulting from the injury which either prevents him from realizing the nature of his act *or controlling his conduct,* his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant is liable. (See Prosser, Law of Torts, 2d ed., pp. 273-274.) We said further that it makes no difference that the decedent "knew what he was doing." If the defendant is to avoid liability the decedent's act must be voluntary, not in that sense. but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself. As will hereinafter appear, we believe that this rule is the one which should apply in workmen's compensation cases, even though section 3600, Labor. Code, prohibits recovery where the injury is "intentionally. self-inflicted." As we point out, suicide cannot be *intentionally* self-inflicted if, in spite of his act being one of conscious volition, the suicide, because of mental condition resulting from the injury, is unable to control the impulse to kill himself.

But this is a proceeding under the Workmen's Compensation Act, in which section 3600, Labor Code, in effect prohibits recovery where the injury is "intentionally self-inflicted." Thus, the real question in the case is, was there substantial evidence that the act of suicide here was "intentionally self-inflicted" in the meaning of the section? Put another way, the question is whether the fact that decedent knew what he was doing made his death an intentionally self-inflicted one.

Generally, it has been held in workmen's compensation cases, "Where the statute excludes compensation for intentionally self-inflicted injuries, death by suicide constitutes such an injury. The right to compensation, however, may depend on whether an employee was sane or insane at the

time of the commission of the act, and there can be no recovery of compensation where the insanity of the person so ending his life has not progressed to the stage of destroying capacity to entertain an intention . . .

"Where the suicide of an employee is directly caused by his injuries and their consequences, his death is not intentionally self-inflicted or wilful so as to bar compensation, where he kills himself under compulsion of an irresistible or uncontrollable impulse, or while in a delirium or frenzy or where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind." (99 C.J.S., § 264, pp. 911-912.)

Campbell, Workmen's Compensation, volume 1, page 236, states it this way: "But where the resulting insanity is such as to cause suicide through a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act, even though the choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury." Hanna, "The Law of Employees' Injuries and Workmen's Compensation," volume 2, page 187, states that California adheres to the general rule as expressed in the two above quotations. The California Industrial Accident Commission has followed that rule in seven cases, in five of which writs of certiorari were denied by the District Courts of Appeal without opinion. With those exceptions, the question as to the effect of suicide in workmen's compensation cases has never been passed upon by our courts.

 In spite of the general rule and the decisions of the commission, we are not persuaded that the mere fact that the employee's act of suicide was a volitional one in that he knew what he was doing when he committed it constitutes the act one that is "intentionally self-inflicted" (Lab. Code, § 3600) or one which should cause a denial of compensation. We think that the test is and should be, not did the employee know what he was doing, but was the compulsion or the impulse to commit suicide one which he could not resist. In the general rule above mentioned the courts practically have stated this very concept, ". . . where he kills himself under compulsion of an irresistible or uncontrollable impulse," yet they have been too narrow in applying it. They have, in effect, incorporated in it M'Naghten's Rule, namely, did the suicide have sufficient mental capacity to know what he was doing.

■ This rule is entirely out of line when applied to workmen's compensation cases, where it is the duty of the courts and the commission to interpret the act liberally in favor of the employee. ■ Too often, in the past, it has been required that in order for compensation to be paid in a suicide case the employee must have been insane in the narrow sense of the word. This is not being realistic. ■ Where an employee receives an industrial injury and the resultant pain is such that he believes he cannot continue to stand it, where he becomes so depressed that he feels that there is only one way out, where any condition results which causes him to feel that death will afford him his only relief, his act of suicide is one directly resulting from his injury, unless it appears that he could have resisted the impulse to so act.

The court in *Whitehead* v. *Keene Roofing Co.* (Fla., 1949), 43 So.2d 464, seems to us to have adopted a more realistic and reasonable view than that expressed in the general rule. In that case the workman fell from a roof on which he was working and sustained serious bodily injuries. He suffered excruciating pain in his leg, back and head, and developed a paralysis of the arm, which he was advised would take some time to clear up. Prior to the accident he had been good-natured and had a phlegmatic disposition, but after the accident became morose and ill-humored. About three months after the injury he took poison, and when asked before he died why he did so he said that "he had simply 'gone nuts.' " (P. 465.) The Florida commission awarded death benefits. The trial court reversed the award because the "deceased was aware of what he was doing at the time he took the poison and of the consequences of his act and that 'at the time his mental condition was such that his intention primarily to take his life was wilful' " and therefore compensation should be denied under a Florida statute which provided that no compensation could be paid " '. . . if the injury was occasioned primarily . . . by the wilful intention of the employee to injure or kill himself . . .' " (P. 465.) The Florida Supreme Court reversed this decision and ordered death benefits to be paid the widow, saying that the trial court's ruling was not "in accordance with the intent and purpose of the Workmen's Compensation Act which . . . is to provide for injured workmen and, in the event of their death from injuries received in their employment, their dependents, so that the burden might not fall on society but on the industry served." (P. 465.)

"The difficulty inherent in proving that one who kills himself by his own hand does so because of injuries sustained in an accident, and as a direct and proximate result thereof, undoubtedly accounts for the diversity of opinion on this question among the courts of this country . . . But we are not persuaded that the fact that a workman *knew* that he was inflicting upon himself a mortal wound will, in all cases, amount to a 'wilful intention' to kill himself, within the meaning of the statute. We believe that in those cases where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered 'wilful' within the meaning and intent of the Act.

"There is no force to the argument, propounded by some courts, that the act of suicide is an independent intervening cause of the death of the workman, thus breaking the chain of causation from the injury to the death of the deceased. While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and death. See *City of Lakeland* v. *Burton,* 147 Fla. 412 [2 So.2d 731]." (P. 465.)

Under the title *"Workmen's Compensation—Insanity as Causal Link Between Injury and Suicide"* in volume 45, number 3, Iowa Law Review, page 669 et seq., appears an interesting and learned article or the subject. Its citation to, and discussion of, the cases in the various jurisdictions dealing with suicide in compensation cases is quite exhaustive. It points out that there is a majority and a minority rule in this country. The majority rule is that in order for the death to be compensable the decedent, at the time of his suicidal act, must be motivated by an uncontrollable impulse or in a delirium of frenzy, without conscious volition to produce death. This rule is based upon the assumption that the act where there is conscious volition is an independent "intervening cause" and is a wilfully self-inflicted act.* The minority rule allows compensation if the injury causes, precipitates

---

*There are only seven states whose workmen's compensation acts make no reference to suicide or intentionally or wilfully inflicted self-injury.

or aggravates the insanity or mental derangement which in turn causes the suicide. Under this rule "work connection" seems to be the primary criterion for granting relief. (See 1 Larson, Workmen's Compensation Law, § 6.50, p. 48.) The minority rule is followed in England (see *Fanning* v. *Richard Evans & Co.* (1923), 16 B.W.C.C. 43), in Florida (*Whitehead* v. *Keene Roofing Co., supra,* 43 So.2d 464), in Mississippi (*Prentiss Truck & Tractor Co.* v. *Spencer* (1956), 228 Miss. 66 [87 So.2d 272, 277-278]), in New York (*Nohe* v. *Sheffield Farms Co.* (1957), 4 App.Div.2d 711 [163 N.Y.S.2d 455]). Massachusetts has enacted a statute codifying the minority rule. (Mass. Gen. Laws Ann., ch. 152, § 26A (1957).) The majority rule has been criticized as being unrealistic and over-restrictive in that it fails to recognize the role which unbearable pain or despair may play in breaking down rational mental processes. As said in *Schofield* v. *White* (Iowa, 1959), 250 Iowa 571 [95 N.W.2d 40, 43], "Suicide is the result of a process that goes from loss of interest to inability to enjoy life entirely, to indifference as to whether or not an individual cares to live, and finally an actual desire to die . . ."

█ In most cases it is unrealistic to determine that suicide is an "independent" intervening cause. A conscious volition to produce death does not necessarily make the suicide a separate agency unconnected with the primary injury, nor an intentionally or wilfully inflicted self-injury. The force set in motion by the original injury may be, and in most cases is, the real cause of the act of suicide. Such forces are employment connected.

A study of the cases, both those applying the majority and those applying the minority rule, indicates that there is an increasing number of situations in which suicide is causally linked to industrial injury, in practically all of which the suicide is the result of a manic depressive state resulting from the injury. It is a contradiction in terms to state that there is no causal connection between an injury which causes a manic depressive state and a suicide which results from that state even though there be a conscious volition connected with it. Volition may be dominated by the mental condition. It is the injury which sets the forces in motion which ultimately bring about the suicide.

In Larson, Workmen's Compensation Law, volume 1, section 36.30, page 508, it is said: "The question whether the actor appreciated the consequences of his act should not be decisive on the fundamental question whether that act was

the natural and foreseeable result of the first injury. To say that it was not such a result, you must take the position that it is unforeseeable that a man, in unbearable pain, will knowingly take his own life. That position is simply untenable, and if any evidence is needed, the number of compensation cases presenting these facts should be proof enough. If the sole motivation controlling the will of the employee when he knowingly decides to kill himself is the pain and despair caused by the injury, and if the will itself is deranged and disordered by these consequences of the injury, then it seems wrong to say that this exercise of will is 'independent,' or that it breaks the chain of causation. Rather, it seems to be the direct line of causation.''

Modern psychiatry knows that a manic depressive condition operates to break down rational mental processes, placing the person afflicted in a mental state in which death actually seems more attractive than living, and in which he may not only have a conscious volition to produce death, but be eager to do so.

 If it can be shown by competent expert testimony that without the injury there would have been no suicide, the injury is the proximate cause of the death. In our case the testimony of Doctor Finley to the effect that a manic depressive patient will plan to take his own life and that decedent planned his suicide over a period of several hours in which he was depressed, practically provides this evidence, even though decedent knew what he was doing. Both the commission and Doctor Finley felt that this latter fact would bar recovery and therefore no attempt was made to learn whether or not the manic depressive state which was caused by the industrial injury was of the type which provided a force which, although not a frenzy, was nevertheless irresistible. That the commission was applying the majority rule is shown by the report of the panel on decision after reconsideration ''that the insanity of Decedent was not such as to cause him to take his life without conscious volition, but, rather, through voluntary choice, breaking the chain of causation arising from the injury. See *Hanna, The Law of Employee Injuries and Workmen's Compensation, vol. 2, page 187.* The death of the employee was therefore not the proximate result of the industrial injury herein.'' The reference to Hanna there states: ''On the question of whether self-destruction following mental derangement caused by industrial injury is compensable, *California adheres to the general rule*

that where there follows, as a result of physical injury, insanity such as to cause the employee to take his own life without conscious volition, there is then a direct and unbroken connection between the injury and the death; *but where the ensuing insanity is such as to cause suicide through a voluntary, wilful choice, determined by a moderately intelligent mental power, which knows the purpose and the physical effect of the suicidal act,* then there is a new and independent agency, namely, the intentional and wilful act of suicide, which breaks the chain of causation arising from the injury." (Emphasis added.) It seems anomalous to hold that "where the ensuing insanity is such as to cause suicide" the suicide was not the result of the injury which caused the insanity, even though the one committing the act knew its "purpose and the physical effect."

Section 3600, Labor Code, requires the self-inflicted act to be intentional. Even in criminal cases the important element of "intent" requires "the sound mind and discretion of the accused." (Pen. Code, § 21.) There can be no intention to commit an act in the sense of the Labor Code section if the mind of the actor is such that it is not sound and that because of compulsion due to that condition he is unable to exercise a sound discretion. While the commission found that decedent's act was consciously volitional it did not find that it was "intentional" in the sense that his mind was sound enough for him to exercise a sound discretion and in the sense of the rule herein discussed.

We believe that in view of the liberal requirements of the California Workmen's Compensation Act the minority rule should be followed, and that the commission and the parties should determine this case in view of that rule. Both because the commission did not view the evidence in the light of that rule, and there is no evidence upon which the commission could have based a finding under that rule adverse to the petitioner, the award must be set aside and a further hearing be held in which the matter will be approached and determined in the light of that rule.

In our case there is no evidence that decedent would have taken his life were it not for the mental condition which the commission found was due to the industrial injury. On the contrary, even the expert relied upon by the commission stated that persons in a manic depressive state will plan to take their own lives. It is unreasonable and unrealistic to hold that suicide occurring when the employee is in such a state

is not the result of the industrial injury when the manic depressive state is. If suicide is a result which may be expected from a manic depressive condition, how can such a result be said to be *intentionally* self-inflicted, even though the person may know what he is doing and its results? The manic depressive condition provides the irresistible impulse. Mere realization of the nature and effect of the suicidal act cannot be controlling.

In *Wilder* v. *Russell Library Co.* (1927), 107 Conn. 56 [139 A. 644, 56 A.L.R. 455], the facts were quite similar to those in this case. The decedent there was a librarian. ''She was very conscientious in her work, temperamentally over-conscientious and zealous for the good of the library, working the number of hours required of her by the employer, and also working many more hours at home evenings on work connected with her library duties, in her desire to carry out her ideas and hopes for the betterment of the library . . . Her position carried with it unusual responsibilities, causing her not only excessive labor but excessive worries . . .

''The decedent was subject by heredity to a predisposition to mental trouble. The long hours she worked caused excessive fatigue. A physical breakdown occurred, which was followed by a nervous breakdown.'' (Pp. 645-646 [139 A.].) She committed suicide.

In our case decedent was overconscientious in his work, worked excessive hours, had responsibilities that caused him excessive labor and worries. Although not subject to mental trouble by heredity, he had had mental trouble before. The long hours of work caused him excessive fatigue. A physical and then a mental breakdown followed. He committed suicide. While the Wilder decision states that the librarian's mental condition amounted to ''insanity'' and that her act was due to an ''uncontrollable impulse,'' it does not appear what the type or extent of that insanity was. In holding that the death was the result of the industrial injury the court stated that in determining whether there is a direct causal connection between an industrial injury and a suicide, the trier of fact must, in effect, answer this question, was the injury a proximate cause of the suicide or was the suicide merely contemporaneous or coincident with the injury? This is but another way of determining whether or not the employee's impulse to commit suicide was an uncontrollable one.

It is evident that the commission believed that the mere fact that decedent realized the nature and effect of his act

made his suicide "intentionally self-inflicted" and was not concerned with the question of whether in spite of his knowledge decedent had the mental capacity to resist the suicidal impulse which may accompany a manic depressive condition. Therefore, the award is annulled with directions to the respondent commission to further determine the matter in accordance with the views herein expressed.

Tobriner, J., and Duniway, J., concurred.

The petitions of respondents Industrial Accident Commission and Fireman's Fund Indemnity Company for a hearing by the Supreme Court were denied August 10, 1960. Schauer, J., was of the opinion that the petition should be granted.