[Civ. No. 31896.   Second Dist., Div. Four.   Feb. 19, 1968.]

CEDRIC THOMAS BEAUCHAMP, a Minor, etc., et al., Petitioners, v. WORKMEN'S COMPENSATION APPEALS BOARD, INGLEWOOD UNIFIED SCHOOL DISTRICT et al., Respondents.

Steven Roseman for Petitioners.

Everett A. Corten, Edward A. Sarkisian, Sheldon M. Ziff, Nathan Mudge, T. Groezinger, Loton Wells, G. K. Bogue and Floyd G. Loughrey for Respondents.

McCOY, J. pro tem.*—This is a timely petition for review of a decision of the Workmen's Compensation Appeals Board which denied death benefits to the minor sons of a school teacher who committed suicide about three weeks after his

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

petition for reconsideration of an award which he considered inadequate was denied.

The decedent was employed as a school teacher by the Inglewood School District when he fell and sustained industrial injury to his back on January 23, 1963. On July 29, 1963, pursuant to a stipulation of the parties, an award issued for temporary disability benefits and medical treatment. On March 8, 1966, supplemental findings and award issued awarding temporary disability through September 1, 1964, and permanent disability rated at 14½ percent, and denying further medical treatment. Reconsideration was denied on April 22, 1966. The suicide by an overdose of barbiturates followed on May 16, 1966.

On June 27, 1966, a claim on behalf of the two minor sons of the applicant was filed by their mother as guardian; a petition to reopen the decedent's case was also filed. On March 21, 1967, the petition to reopen was denied and an award issued limited to an order that all benefits accrued and unpaid to the applicant be paid to the minors. Death benefits were denied. The board denied reconsideration and this petition followed. Petitioners' principal contention is that the denial of their application for reconsideration was based on an incorrect interpretation of the law. We agree.

The decedent was discharged from the armed forces in 1945 upon a diagnosis that he was of "psychopathic personality, emotional instability." There is no medical or psychiatric record of decedent from 1945 to 1960. Decedent had an injury to his low back on May 16, 1960, when working for U.S. Gypsum Company and developed an emotional reaction of a mild nature. He suffered a skull fracture, low back injury and ulcer symptoms as the result of an auto accident on April 1, 1962, in which the other occupant of the car was apparently killed.

In September 1962 applicant began to teach chemistry in the Inglewood school system, having at that time completed his college course. On January 23, 1963, he twisted his back while standing on a table in a classroom. Decedent was disabled by this accident and received temporary disability benefits until September 3, 1963. Apparently the Inglewood Unified School District did not reemploy him for the next year and he obtained a position with the Reedley Joint Union High School in September of 1963. During that school year he missed so many days of work because of his back condition that he was fired in June of 1964. He subsequently obtained

an award of temporary disability through September 1, 1964. Thereafter he obtained part-time and temporary work as a substitute teacher in another school, but he was unemployed the great majority of the time from June of 1964 until his death on May 16, 1966. In September of 1965 he attempted suicide. His death was caused by acute barbiturate intoxication.

Dr. La Briola examined him on May 31, 1963, and reported that decedent, having refused surgery, no further conservative care would be of value and the continuing low back pain should be apportioned at one-third attributable to the January 1963 incident and two-thirds to the previous back injuries in 1960 and 1962. Dr. La Briola commented that the decedent ''continues constant pressure over the telephone, writes innumerable letters and worries himself and everybody else sick about his condition.''

Dr. Rand, an independent medical examiner, examined decedent and reported on March 18, 1965, as follows: ''This man's file is long and complicated. The reports of 33 physicians have been read but I will not attempt to comment on them in detail. Generally speaking, this man has been of an unstable personality since early years. He was discharged from the Army at 18 years of age because of psychopathic personality and emotional instability. He has been dismissed from three positions—first with the Gypsum Company, second at the Reedly School, and third, when teaching delinquents. I think we may date his present symptoms from the time he twisted his back while standing on a table in January of 1963. His present symptoms of low-back pain and pain in the left lower extremity probably have resulted from this. The possibility of a herniated lumbar disc is considered but is not believed to be likely. I think that he strained his low back which gives rise to his present symptoms. These do not appear to be very severe. I think he should be able to teach school provided that he does not have to do any outside activities. His unstable personality seems to be his chief handicap. This makes it difficult to estimate how he would again fit into a teaching schedule. The case is not surgical at this time. It is suggested that he remain under the care of Dr. Rodriguez who apparently understands and helps him.''

Dr. Strassman, a psychiatrist, testified that he saw the decedent on three occasions and had some telephone communications with him. At his initial interview consideration was being given to the question of the need of the decedent for

surgery. At that time Dr. Strassman formed the conclusion that decedent had a personality defect that had a predisposition toward psychiatric abnormality but he did not believe an abnormal psychiatric entity was presented. The decedent had no abnormal thought content and appeared a passive individual who tended to be righteous and to express unwarranted indignation. He seemed like the kind of person who goes to great lengths to gain a point. He was one who needed vindication. Dr. Strassman was not aware that he had had a psychiatric discharge from military service at that time. At the first visit in 1964 the doctor had the impression that the decedent was constructively seeking his rehabilitation. Thereafter there was an insidious regression. Decedent became obsessed about his failure to make his point regarding his need for medical treatment and his right to return to work as a teacher. He developed the feeling that there was a conspiracy to keep him from working. The truth was that the employment applications of the decedent were rejected because he was not insurable. The decedent's letters to governmental agencies reflected an abnormal psychiatric condition and an increasing volume of hopelessness. There began to evolve a concept of suicide as a form of escape. He regarded his loss of teacher status as a personal affront and there was nothing more important to him. In September 1965 he obtained part-time employment with a Catholic school. This was distasteful to him. He lapsed into a sense of hopelessness and again began to think of suicide as a release.

Dr. Strassman further testified that at the time of the suicide attempt in September 1965 the diagnosis of the decedent's condition was of acute agitated depression. The doctor agreed with a notation of county hospital records that the real reason why the decedent could not restore himself to his former teacher status was his emotional problems but the doctor stated the decedent believed himself capable of performing as a teacher and further believed that it was the industrial injury that precluded him therefrom.

As summarized by the referee, Dr. Strassman testified that: "He does not believe the industrial injury in this case was the cause of the suicide; however, it produced the inability to work which in turn produced the hopelessness as to ever being able to return to status as a teacher, and the obsession that unless he could resolve his medical needs and be again accepted as a teacher, that he could not go on living. The idea of suicide occupied his mind for many months. Whenever a

ray of hope presented itself it would be postponed. He would return to the idea of death when the ray of hope was extinguished. It was a situation in which the deceased balanced the anguish of going on living against the prospect of getting what he wanted, and he elected to die. He believes that if the deceased had not suffered the industrial injury he would be alive today. He does not think that the deceased was driven to suicide by the distasteful character of his part-time teaching in the Catholic school."[1]

Neither the employer nor the insurance carrier presented any medical evidence.

In his initial opinion dictated March 16, 1967, the referee said: "The record in this case leads to conclusions that the deceased found himself in an untenable position in this society. The record discloses he came to the conclusion that were he unable to resolve his difficulties he would resort to the solution of his problems through ending his mortal existence. When he thought he had exhausted every prospect of making a satisfactory life for himself he committed suicide. It may well be that were an industrial injury to so derange an industrially injured employee so that in an irrational frenzy he took his own life it could be held that his death resulted from an injury arising out of and occurring in the course of his employment. However, Labor Code, section 3600 specifically excludes from compensability the situation in which the employee wilfully and deliberately causes his own death. Although the deceased in this case was mentally sick, it is clear that he took his own life after weighing the pain he believed would be his lot were he to go on living. His suicide must be deemed wilful and deliberate. Accordingly, no death benefit can be awarded herein."

In his report on the applicant's petition for reconsideration the referee said, so far as relevant here: "In this case, the record amply demonstrates the applicant's considered intent to take his own life and the effectuation of that intent. The case is to be distinguished from a totally different situation in which an employee engages in highly reckless acts that disregard his personal safety and involve an almost certain consequent death. The point of distinction lies in that on one hand the employee loses a gamble that he can avoid death and

---

[1] In his report to the applicant's attorney dated December 6, 1966, Dr. Strassman said: "It is my opinion that the industrial accident created a chain of circumstances which exacerbated elements of Mr. Beauchamp's personality that eventuated in his death."

on the other hand, a situation in which the employee does those things which he intends to and which do result in his demise." Having reviewed the record, and the report of the referee on the petition for reconsideration, "which we adopt and incorporate herein," the board found that there is no merit in the petition for reconsideration and ordered that it be denied.

The employer and its carrier contend that the finding that death was not industrially caused implies a finding that the decedent could have resisted the impulse to suicide and that he willfully and deliberately caused his own death. They contend the reasonable inferences from the testimony and reports of Dr. Strassman support such an implied finding. The appeals board urges the same contention, and argues that the case history of the decedent indicates that he willfully and deliberately caused his own death and that "It cannot reasonably be concluded that Dr. Strassman's stated view that the 'industrial accident created a chain of circumstances which exacerbated elements of Mr. Beauchamp's personality that eventuated in his death' is necessarily sound as to its premises or impelling as to his conclusions." These contentions are not tenable.

As we read the record, both the referee and the board decided the case upon a theory which is contrary to the settled law of this state.

Before 1961, Labor Code, section 3600 in effect prohibited recovery of workmen's compensation benefits where the injury was "intentionally self-inflicted." In *Burnight* v. *Industrial Acc. Com.,* 181 Cal.App.2d 816 [5 Cal.Rptr. 786], the commission had found that the employee was subjected to stress situations arising out of and occurring in the course of his employment which precipitated a nervous breakdown and manic depressive psychosis but it further found that death was not proximately caused by the injury. In effect, the commission made an implied finding that the fact that the employee premeditated the suicide made it intentionally self-inflicted despite the fact that he had a mental aberration. The court expressly rejected the rule of the majority of jurisdictions that in order for the death to be compensable the decedent, at the time of his suicidal act, must be motivated by an uncontrollable impulse or in a delirium of frenzy without conscious volition. "[W]e are not persuaded," said the court (pp. 822-823), "that the mere fact that the employee's act of suicide was a volitional one in that he knew what he was

doing when he committed it constitutes the act one that is 'intentionally self-inflicted' (Lab. Code § 3600) or one which should cause a denial of compensation. We think that the test is and should be, not did the employee know what he was doing, but was the compulsion or the impulse to commit suicide one which he could not resist. In the general rule above mentioned the courts practically have stated this very concept, '. . . where he kills himself under compulsion of an irresistible or uncontrollable impulse,' yet they have been too narrow in applying it. They have, in effect, incorporated in it M'Naghten's Rule, namely, did the suicide have sufficient mental capacity to know what he was doing.

"This rule is entirely out of line when applied to workmen's compensation cases, where it is the duty of the courts and the commission to interpret the act liberally in favor of the employee. Too often, in the past, it has been required that in order for compensation to be paid in a suicide case the employee must have been insane in the narrow sense of the word. This is not being realistic. Where an employee receives an industrial injury and the resultant pain is such that he believes he cannot continue to stand it, where he becomes so depressed that he feels that there is only one way out, where any condition results which causes him to feel that death will afford him his only relief, his act of suicide is one directly resulting from his injury, unless it appears that he could have resisted the impulse to so act." Later in its opinion the court said (p. 825) : "In most cases it is unrealistic to determine that suicide is an 'independent' intervening cause. A conscious volition to produce death does not necessarily make the suicide a separate agency unconnected with the primary injury, nor an intentionally or wilfully inflicted self-injury. The force set in motion by the original injury may be, and in most cases is, the real cause of the act of suicide. Such forces are employment connected.' '[2]

In 1961, a year after the decision in *Burnight,* section 3600 of the Labor Code was amended to provide that an industrial injury is compensable " (f) Where the employee has not willfully and deliberately caused his own death." In our opinion this amendment is consistent with the decision in *Burnight.*

We are satisfied from our review of the record that in

---

[2]In addition to the authorities discussed by the court in *Burnight* v. *Industrial Acc. Com.,* 181 Cal.App.2d 816 [5 Cal.Rptr. 786], see also: Annot. Suicide as Compensible Under Workmen's Compensation Act, 15 A.L.R.3d 616, 631-632; Case Note on *Burnight,* 8 U.C.L.A. L.Rev. 673.

the instant case the board did not view the evidence in the light of the rule stated in *Burnight*. As the court said in that case (181 Cal.App.2d at p. 826): ''If it can be shown by competent expert testimony that without the injury there would have been no suicide, the injury is the proximate cause of the death.'' In our opinion, the testimony of Dr. Strassman meets this test.

The decision is annulled with directions to the respondent board to further determine the matter in accordance with the views expressed herein.

Files, P. J., and Kingsley, J., concurred.

The petitions of the respondents Workmen's Compensation Appeals Board and State Compensation Insurance Fund for a hearing by the Supreme Court were denied April 17, 1968. Traynor, C. J., Burke, J., and Sullivan, J., were of the opinion that the petition should be granted.