[Civ. No. 9007.    Fourth Dist., Div. Two.    Sept. 19, 1968.]

GLADYS I. VANDAGRIFF et al., Petitioners, v. WORK-
    MEN'S    COMPENSATION    APPEALS    BOARD,
    CRANE COMPANY et al., Respondents.

Sanders & Todd and Arthur R. Todd for Petitioners.

Everett A. Corten, Edward A. Sarkisian, Nathan Mudge,
T. Groezinger, Loton Wells, G. K. Bogue and Arthur C. Jones
for Respondents.

McCABE, P. J.—Decedent was born in 1925 and married
petitioner Gladys on August 29, 1947. Of this marriage, there
were born the three minor children, who, with their mother,
are parties to this proceeding through their guardian ad
litem.

The medical history reveals decedent had an injury to, or
difficulties with, his lower back in 1952. Although this may
have been discomforting to him, he worked until an injury to
his back occurred in November 1963. Following the injury he

did not work for two weeks but then resumed his job. For some considerable period of time before and after this accident, he received medical attention for his lower back condition. For this injury he received a 19 percent disability rating. He began wearing a back support, although the record is not clear as to the length of time, and he continued work as a caster for Crane Company until January 15, 1965. As of this latter date, he had been employed by Crane Company for some 12 years. On January 15, 1965, in lifting a 90-pound object, he injured his back.

In February 1965 he was advised he would not be able to continue his work. From that time on until his death on October 13, 1966, there is no evidence in the record that decedent attempted to work at any type of gainful employment. Decedent was hospitalized in April 1965 for a period of eight days, at which time he was placed in traction. In May 1965 he was again hospitalized because of the injury to his back. As early as August 9, 1965, Dr. Reid, in his report to the State Compensation Insurance Fund, indicated, among other things, that Dr. Estridge had examined Mr. Vandagriff on April 28, 1965, and concluded there was a large functional overlay in the patient's complaints. From his examination of the reports of Drs. Marinacci, Carmack, Estridge and Ison (who function in various fields of medicine), and from his own examination, there appeared to be serious functional overlay, and there was evidence of a disc herniation in the lumbar region. Not being successful in any other treatment, a laminectomy was performed in October 1965. In the report of this operation, Dr. Reid, the surgeon, stated: ''The L-5 nerve root was reflected medially after dissection from the underlying ligament. The annulus fibrosus and posterior ligament were then incised and the space evacuated with curettage and rongeurs. Because of a very percipitous drop in blood pressure prior to opening the posterior-longitudinal ligament, no further attempt was made to explore the lower space. . . .'' From a prior electromyogram, there was some indication there might be difficulty at L-1. The reference to exploring the ''lower space'' is apparently to the L-1 area of the spinal structure. Eventually there was a healing of the incised area with resulting sensitivity over the scar. No further operations were performed, although decedent had numerous examinations by, and consultations with, doctors. In March 1966 Dr. Reid reported to the State Compensation Insurance Fund that decedent had multitudi-

nous complaints and diffusion of them; the complaints defied analysis and treatment; a recent electromyogram suggested a sizable involvement at the left first sacral nerve root; it was possible the lower inter-space was still causing difficulty, but that there was no basis referrable to the lumbar spine for most of Mr. Vandagriff's complaints under any circumstances.

As on previous occasions, Mr. Vandagriff, on April 12, 1966, complained to Dr. Reid of headaches, scalp soreness, attacks of vasomotor activity, with sweating, cyanosis and coldness of the extremities. Dr. Reid concluded from the April 1966 examination that the patient's condition was substantially the same as compared to previous examination; the patient remained completely disabled from his previous occupation, and many of the patient's complaints did not relate to his lumbar condition or the surgery.

In reporting on his examination of the patient, which took place on May 24, 1966, Dr. Reid's recommendations remained the same, and he noted that the patient "has multitudinous complaints far removed from his industrial injury or surgery thereof. . . ."

Dr. Reid again examined the patient and in a reporting letter, dated June 29, 1966, he stated the complaints were the same and "In general he appears unwilling to pursue the matter much further, and his over-all response would probably mitigate against any physician attempting any major therapeutic undertaking anyhow . . . It is my impression that Mr. Vandagriff's condition is probably permanent and stationary with the subjective complaints noted previously and the objective findings listed above as regards to the low back and lower extremities. The complaints about the head and neck are unrelated to his previous injury. It seems unlikely to me that he can perform in a gainful capacity at this time. And from the neurosurgical standpoint, there does not appear to be any further measures which could be instituted which the patient would agree to which would offer him any chance of improvement. . . ."

In his report of the August 26, 1966, examination of the patient, Dr. Reid states the complaints were the same as those made on other examinations and concluded the condition was permanent and stationary with the disability previously noted.

The record reflects that from on or about the date of the surgery to his death, Mr. Vandagriff was in an ambulant state, using a cane on most occasions. From the early exam-

inations by doctors, Mr. Vandagriff's obesity was noted. In several reports which the board had before it, there are statements that there was advice to Mr. Vandagriff to reduce, but there was no resultant reduction of weight. None of the examining doctors noted any depressed mental attitude on the part of the patient nor any complaint of depression. The testimony regarding depression came from observing lay witnesses. This factor then became part of the testimony of the experts who testified and which testimony became part of the record considered by the Board on its reconsideration.

Before and subsequent to his marriage in 1947, decedent had homosexual tendencies. This was known to petitioner Gladys before she married him. It was a subject of discussion between them. In the same year of the marriage, she filed for divorce. The record is silent as to the disposition but we can infer that aside from the filing of it, no further proceedings were had. The marriage was normal under the circumstances, with intervals of disagreements, arguments, and discussions. Sometime before 1960, the exact date being uncertain, and upon the suggestion of the Family Service, Mr. Vandagriff once sought out-patient psychiatric treatment at Patton State Hospital. Mr. and Mrs. Vandagriff had discussed his problem and had gone to the Family Service which eventuated in the visit to Patton State Hospital. There is no official record in the file at Patton of this visit. Although Mr. and Mrs. Vandagriff knew of the advisability of psychiatric treatment, the cost of $18-$20 per hour exceeded their financial ability to pay. Other than the one visit to Patton, there was no psychiatric treatment sought or obtained. Mrs. Vandagriff testified that decedent would "turn to this" when he could not work out a problem or would not take time to work it out. She also testified that at first the homosexuality was a "big problem" but did not believe it was later.

In January 1960, decedent was charged and convicted of the crime of molesting a minor under the age of 18 years. One of the terms of probation which was granted provided Mr. Vandagriff was to seek psychiatric care. There is nothing in the record indicating such provision of probation was carried out. The problem continued to exist.

The petitioner Gladys testified on cross-examination that in 1961 or 1962 decedent might have said, "I'll kill myself," but he never threatened to do so to a point where she was "scared,"

According to the testimony of petitioner Gladys, until about May 1966, decedent had not been violent but after this date, he "turned on" the children and his wife. He mistreated his children, told them he didn't care whether they died, and hoped they would starve to death. About this same period, defendant threatened to kill his wife and children. On one occasion he tried to kill her by attempting to hit her on the head with a hammer. Beginning about this same time, decedent had some loss of memory. At times he would go somewhere and not remember how he got there or why he was there. Mrs. Vandagriff reported these incidents to Dr. Reid. She testified Dr. Reid did not "seem concerned about it."

Two witnesses who had known and worked with decedent for some 12-16 years described him as a good worker, but sometimes emotional. One witness stated that after the surgery decedent was very low in spirits. The same witness noticed a dramatic change in decedent's attitude toward his children. The exact date when this change took place is uncertain from the testimony although it is clear the change took place some months after the October 1965 operation.

On September 14, 1966, petitioner Gladys filed an action for divorce against decedent. An order to show cause was issued and served upon him. At or about this time, one of the two witnesses described above testified he tried to get decedent to make up with his wife, but received only a reply that "he couldn't do that." The other witness received a telephone call from decedent in September 1966. Decedent asked his friend about the work at the factory, then informed his friend his wife had left him, and made a statement to the effect it would be better if he (the decedent) passed on.

During the last four or five months of his life, and about every week or two during that period, Mr. Vandagriff threatened to kill himself. In July 1966 Mr. Vandagriff attempted suicide by use of a gun which Mrs. Vandagriff took from him. On that occasion he took a pill and went to bed. Later, he called his daughter and informed her he had taken sleeping pills. Mrs. Vandagriff did discover that he had sleeping pills available and took him to the hospital. It was there determined he had taken nerve pills, not sleeping pills. He was put to bed where he slept for about two days.

Directing our attention to the other evidence preceding the filing of the divorce action, we find that for some months Mrs. Vandagriff had informed her husband that she could not tolerate his conduct, his threats to the children, and she was

"scared" of him. She attempted to have him seek help for his problems, but all of this created no activity on his part. For a long period before the summer of 1966, Mr. Vandagriff carried on very little physical activity and primarily was in bed for extended periods of time.

After the divorce proceedings were commenced, there was a physical separation of the living conditions of the parties, but its exact nature is not clear from the record. From the testimony, it appears neither party desired a divorce, but Mrs. Vandagriff had filed for it because she was afraid of him, could not tolerate his conduct toward her and the children and she thought it would cause him to seek aid for his condition. On the date when the parties were to appear for a hearing on the order to show cause, there were mistakes as to the time when each was to appear, and each appeared on a different hour of the same day. There appears to have been no determination on that legal process. However, the parties did have a hearing before the court of reconciliation, and it was recommended to them that they seek appointments with the Family Service. Mr. Vandagriff had an appointment for October 5, 1966. After the court proceedings, and on October 1, the parties had a conference with their minister. At the session many accusatory statements were made—primarily by Mr. Vandagriff. The session did not have the desired results of clarifying the minds of the parties or of having Mr. Vandagriff seek aid for himself.

On October 5, the date decedent shot himself, the parties had talked by telephone. Also, Mrs. Vandagriff saw her husband in order to aid him in moving some of his personal property. Upon her return to the place where she was living, the telephone was ringing. Mr. Vandagriff was calling and informed her he was going to kill himself. She tried to talk him out of doing the act and talked to him about going to the reconciliation court and make an appointment with the Family Service, and going to see the minister the next evening. Mr. Vandagriff said, "No, I am going to kill myself," and discontinued the conversation. Mrs. Vandagriff immediately telephoned the neighbor next door to the place where Mr. Vandagriff was living. In that conversation, Mrs. Vandagriff asked the neighbor if she could see Mr. Vandagriff; the neighbor replied in the affirmative, and that he was standing at the back door. Mrs. Vandagriff informed the neighbor of Mr. Vandagriff's intentions and asked the neigh-

bor to watch him. Immediately the neighbor replied she had heard a shot. Mrs. Vandagriff promptly telephoned the police. Mr. Vandagriff died on October 13, 1966, of the wound in the head, self-inflicted on October 5, 1966.

At the hearing, two medical doctors, qualified as experts in the field of psychiatry, testified. Dr. Wilkins was called as a witness by petitioner and Dr. Perlson was called as a witness for respondents. Neither doctor had seen nor talked with decedent before his death. Dr. Wilkins testified he had examined the complete file. He concluded that decedent, a psychotic, had been mentally disturbed over a prolonged period of time which had a gradual onset, becoming obvious shortly after the October 1965 operation; that because of the increase in emotional upset immediately before his death, decedent could not form a rational intent; irrationality was the keynote of decedent's behavior at the time of death; decedent had been depressed; had worried about his inability to work again, with no hope for the future.

Before he testified, Dr. Perlson had not had an opportunity to examine the records of Good Samaritan Hospital which contained the reports of the October 1965 operation because they had been removed from the file. He testified that the examining doctors could not find anything organically wrong from the surgery, and the doctors felt that all of Mr. Vandagriff's symptoms were without basis referrable to his back injury; that decedent may have had a functional problem; that everything which happens to an individual in his life has some effect in shaping his personality or attitude; ''either we accept everything that happens in a person's life as being contributory to his final demise and the way he does it or we have got to draw a line;'' the causative factor of the back injury was secondary to decedent's homosexuality; decedent's back injury was not the basis for his depression; neither depression nor homosexuality was mentioned in any examining doctors' reports; decedent felt the depression was not related to the injury or he was ashamed of his homosexuality and became depressed; that he could give no percentage factor of contribution of the industrial injury toward the death of Mr. Vandagriff although seemingly admitting that the injury could be a causative factor of some relatively small degree. Since Dr. Perlson had not had a review of the hospital records and at the time he testified did not have, the Good Samaritan Hospital record, he could only testify in the operative area from a March 21, 1966 letter of Dr. Reid to which

he was referred. The operative details were not in that letter. To the extent the letter gave information concerning the operation, Dr. Perlson testified a person could go eight minutes before there would be any cerebral anoxia, and from the context of the letter, he could not testify as to what was meant by neurogenic shock; that if cerebral anoxia occurs, it would be expected that there would be defects in thinking capacity, concentration capacity, or, in his judgment, higher functions of the brain. In Dr. Perlson's study, he found no brain damage causing difficulty in Mr. Vandagriff's higher mental functions.

The board, after granting the petition for reconsideration, and as a prelude to its findings of fact and award, stated: ". . . from the circumstances surrounding the suicide, it is clear that the employee wilfully and deliberately took his own life and that his industrial back injury was not the causative factor. We also conclude that recovery is barred by subsection (f) of Labor Code, section 3600. We are therefore of the opinion that the reconsideration should be granted and the award of death benefits annulled." The board made a specific finding that the injury arose out of, and occurred in the course of, decedent's employment, and (2) "Applicant's death on October 13, 1966, did not proximately result from his industrial injury. . . ." However, the board made no specific finding the suicide was wilful and deliberate. The board made no finding or statement regarding irresistible impulse.

At the time of *Burnight* v. *Industrial Acc. Com.*, 181 Cal. App.2d 816 [5 Cal.Rptr. 786] (Petition for hearing denied by the Supreme Court), subsection (3), Labor Code, section 3600, as now, prohibited recovery of workmen's compensation benefits where the injury was "intentionally self-inflicted." In *Burnight,* the appellate court followed the reasoning that death from suicide constitutes an injury under workmen's compensation cases and under the then section 3600, subdivision (e), Labor Code. In that decision, the appellate court put the question for determination, ". . . whether the fact that decedent knew what he was doing made his death an intentionally self-inflicted one."

At page 822, the court said: "In spite of the general rule and the decisions of the commission, we are not persuaded that the mere fact that the employee's act of suicide was a volitional one in that he knew what he was doing when he

committed it constitutes the act one that is 'intentionally self-inflicted' (Lab. Code, § 3600) or one which should cause a denial of compensation. We think that the test is and should be, not did the employee know what he was doing, but was the compulsion or the impulse to commit suicide one which he could not resist. In the general rule above mentioned the courts practically have stated this very concept, '. . . where he kills himself under compulsion of an irresistible or uncontrollable impulse,' yet they have been too narrow in applying it. They have, in effect, incorporated in it M'Naughten's Rule, namely, did the suicide have sufficient mental capacity to know what he was doing.

"This rule is entirely out of line when applied to workmen's compensation cases, where it is the duty of the courts and the commission to interpret the act liberally in favor of the employee. Too often, in the past, it has been required that in order for compensation to be paid in a suicide case the employee must have been insane in the narrow sense of the word. This is not being realistic. Where an employee receives an industrial injury and the resultant pain is such that he believes he cannot continue to stand it, where he becomes so depressed that he feels that there is only one way out, where any condition results which causes him to feel that death will afford him his only relief, his act of suicide is one directly resulting from his injury, unless it appears that he could have resisted the impulse to so act.''

In the following year after the 1960 decision in *Burnight,* the Legislature, although not striking subdivision (e) which was referred to in the *Burnight* case, added subdivision (f) which has provided, since 1961, that compensation for injury is allowable "Where the employee has not willfully and deliberately caused his own death.''

Subsequent to this amendment to section 3600, *Beauchamp* v. *Workmen's Comp. App. Bd.,* 259 Cal.App.2d 147 [66 Cal.Rptr. 352] (petition for hearing denied by Supreme Court) involving a suicide after an industrial injury was decided. As we read *Beauchamp,* it determined that the test of *Burnight* under subdivision (e) of section 3600, Labor Code, had equal application to the newly added subdivision (f), and the board did not review the record in *Beauchamp* in light of the determination of *Burnight* v. *Industrial Acc. Com., supra,* 181 Cal.App.2d at p. 826: "If it can be shown by competent

expert testimony that without the injury there would have been no suicide, the injury is the proximate cause of the death." In neither *Burnight* nor *Beauchamp* was there such a finding or determination. In *Beauchamp,* the court annulled the decision of the board with directions to the board to further determine the matter in accordance with that opinion.

In both *Burnight* and *Beauchamp* there had been a military history and a medical discharge several years before the industrial injury. In *Burnight,* the diagnosis of the military authorities was that decedent suffered from "manic depressive psychosis and schizophrenic and paranoid tendencies." The military authorities determined the illness for which he was hospitalized for three months in 1951 was not a result of or aggravated by his military service. Mr. Burnight was hospitalized and on September 21, 1957, the diagnosis was " '. . . (1) acute anxiety reaction with depressive and schizoid features, and (2) encephalopathy due to Vitamin B deficiency.' " Later, and on September 27, 1957, Burnight left his wife and home, registered at a cheap hotel, with a fictitious home address, and was found dead, having committed suicide.

Somewhat the same conduct pattern is reflected in *Beauchamp.* In 1945 Beauchamp was discharged from the military service with a diagnosis of "psychopathic personality, emotional instability." In 1960 he suffered an industrial injury to his low back and developed an emotional reaction of a mild nature. In 1962 he suffered a skull fracture, low back injury, and ulcer symptoms as a result of an automobile accident in which the other occupant of the vehicle was "apparently killed." Beauchamp, in September 1962, began to teach chemistry in the Inglewood School District, and on the following January, twisted his back while standing on a table in a classroom, for which he received temporary disability benefits. From that time, he was unemployed except for a short period, and in September 1965 attempted suicide. His suicidal death in May 1966 was accomplished by an overdose of barbiturates.

In *Beauchamp* the appellate court rejected the contention of respondents that the finding that death was not industrially caused carries with it an implied finding decedent could have resisted the impulse to suicide, and that he wilfully and deliberately caused his own death.

In the case at bench there was a finding that the death was not industrially caused.

In *Beauchamp, supra,* 259 Cal.App.2d at p. 151, the appel-

late court recited some statements contained in the referee's intitial opinion, which read: " 'Although the deceased in this case was mentally sick, it is clear he took his own life after weighing the pain he believed would be his lot were he to go on living. His suicide must be deemed wilful and deliberate. Accordingly, no death benefit can be awarded herein.' "

In its reconsideration in *Beauchamp* the board adopted and incorporated the report of the referee and denied the petition for reconsideration.

In the case at bench the board not only granted the petition for reconsideration but annulled the referee's recommended award of death benefits. Thus, these actions force a sole reliance upon the "Opinion and Orders of the Board." The board, as it did in *Beauchamp,* states it reviewed the entire record. After this review, it drew certain conclusions in the "opinion" section of the document but failed to state the evidence and reasons in detail for its conclusions. As stated in *Evans* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 753 [68 Cal. Rptr. 825, 441 P.2d 633] : " 'The purpose of the requirement that evidence be stated and reasons detailed appears analogous to that of the requirement of section 1705 of the Public Utilities Code that decisions of the Public Utilities Commission contain separately stated findings of the basic facts upon all material issues.' " The decision of the Supreme Court in *Evans* is premised upon the requirements set forth in section 5908.5, Labor Code.

At the time the board had before it the case at bench, the *Burnight* case had been decided and section 3600, subdivision (f), *supra,* had been enacted. The *Beauchamp* decision, interpreting section 3600, subdivision (f), had not been made a matter of record. Although section 5908.5, Labor Code, in its present form had been enacted, the decision in the *Evans* case had not been filed. Therefore, in the case at bench the board did have the benefit of *Burnight* and section 5908.5, but it did not have the guidance of *Beauchamp* and *Evans.*

For the reasons stated the decision of the board following reconsideration is annulled with directions to the respondent board to further determine the matter in accordance with the views expressed herein.

Kerrigan, J., and Tamura, J., concurred.