1210

Curtis REINKING; Carol Reinking,
Plaintiffs–Appellees,

v.

PHILADELPHIA AMERICAN LIFE
INSURANCE COMPANY,
Defendant–Appellant,

and

Tennessee Gas Pipeline Company; ICH
Corporation, Defendants.

Curtis REINKING; Carol Reinking,
Plaintiffs–Appellants,

v.

PHILADELPHIA AMERICAN LIFE
INSURANCE COMPANY,
Defendant–Appellee,

and

Tennessee Gas Pipeline Company; ICH
Corporation, Defendants.

Curtis REINKING; Carol Reinking,
Plaintiffs–Appellees,

v.

PHILADELPHIA AMERICAN LIFE
INSURANCE COMPANY,
Defendant–Appellant,

and

Tennessee Gas Pipeline
Company, Defendant.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1990.

Decided Aug. 8, 1990.

As Amended Aug. 17, 1990.

David R. Sonnenberg, argued (David R. Rosenberg, on brief), Levan, Schimel, Richman, Belman, Abramson & Scanlan, P.A., Columbia, Md., for defendant-appellant.

Warren D. Stephens, McCarthy, Bacon, Costello & Stephens, Landover, Md., for plaintiffs-appellees.

Before MURNAGHAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland (sitting by designation).

FRANK A. KAUFMAN, Senior District Judge:

The defendant Philadelphia American Life Insurance Company (PALICO) appeals a district court judgment ordering it to pay medical benefits and attorney's fees for injuries which Carol Reinking incurred when she attempted to commit suicide. Because the district court properly applied the law and was not clearly erroneous in finding that Mrs. Reinking lacked the mental capacity to injure herself intentionally, we affirm the judgment of the district court.

## I.

Carol Reinking suffered a miscarriage in April 1986. Children had been at the center of her life, and the traumatic loss of her child left her with an extreme sense of failure. She sought help from her doctor, family, and friends, but she found herself unable to cope with her grief. According

to expert medical testimony introduced at trial, Mrs. Reinking suffered from major depression, a mental disorder characterized by loss of weight, sleeping problems, excessive guilt, and suicidal intentions. Further testimony indicated that the depression grossly impaired her judgment, prevented her from formulating or considering options, and inhibited her ability to engage in rational thought.

On May 20, 1986, unable to cope with the miscarriage and unable to conceive of any other alternative that would end her pain, Mrs. Reinking attempted to commit suicide. While her husband was upstairs, she went into their bedroom, took his pocket knife, and stabbed herself 11 times in the arm and wrist, 6 times in her neck, 7 times in her chest (nicking her heart twice), and 8 times in her abdomen. She then thrust the knife into her thigh, virtually severing a finger when the blade closed. Mrs. Reinking injured almost every vital organ in her body as well as severing numerous arteries, tendons, ligaments, and nerves. Despite the extreme brutality of her injuries, she testified that she felt no pain as she inflicted them.

Still conscious after having stabbed herself 32 times, Mrs. Reinking attempted to leave the house to lie down under a bridge and bleed to death. After putting on extra clothing so she "wouldn't look all bloody ... walking down the street," she passed out before she was able to get out the door. Her husband heard the fall and found her when he came downstairs to investigate. Miraculously, she survived. Her recovery, however, has been difficult, and she had incurred medical expenses in the vicinity of $70,000 at the time of trial.

The Reinkings filed a claim for medical benefits under their insurance policy with defendant PALICO. PALICO denied the claim under a provision in the policy excluding coverage for "intentionally self-inflicted injuries." After several unsuccessful appeals within the company, the Reinkings instituted suit in state court to collect the policy benefits. The suit included allegations of breach of contract, breach of fiduciary duty, intentional infliction of emotional distress, and violation of the Employee Retirement Income Security Act of 1974 (ERISA).[1] PALICO removed the case to federal court. Prior to trial, the district court dismissed the state law claims as pre-empted by ERISA.

The heart of the Reinkings' claim is that, even though Mrs. Reinking inflicted her own injuries, her mental illness rendered her unable to do so "intentionally." During a bench trial, the parties each presented expert testimony concerning Carol Reinking's mental condition. All agreed that she was suffering severe mental depression.[2] They also agreed that her acts were purposeful in that she understood the character of her actions and sought to end her life. PALICO's experts testified that she was not delusional or psychotic. The plaintiffs' experts indicated that she could not formulate options and that, while she may have been "purposeful," she was not "rational."

PALICO argued that because Mrs. Reinking understood the character of her actions and sought to end her life, her actions were "intentional" and excluded under the policy. PALICO also asserted that whether or not the trial court agreed with PALICO's decision to deny benefits, the district court should only have reversed that denial if that denial constituted an abuse of discretion. Applying the principles articulated in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the trial court reviewed *de novo* the company's decision to deny benefits. On the merits, the court found that Mrs. Reinking was incapable of forming the requisite intent to injure herself and ordered PALICO to pay benefits. The court also awarded the Reinkings attorney's fees under ERISA of over $35,000. PALICO appeals the award of benefits and the grant of attorney's fees while the

---

1. The suit challenges PALICO's eligibility determination under 29 U.S.C. § 1132(a)(1)(B).

2. While Mrs. Reinking admitted to smoking PCP a day or two before the suicide attempt, the evidence in the record indicates that that action had little impact on her mental capacity.

Reinkings cross-appeal the district court decision that they may not recover extra-contractual damages under the ERISA statute. We affirm.

## II.

■ PALICO contends that the district court misapplied *Firestone* in determining that PALICO's decision to deny benefits was subject to a *de novo*, rather than an abuse of discretion, standard of review. In *Firestone*, the plan administrator had interpreted the term "reduction in work force" not to include the sale of a division to another company and denied benefits to workers in that division based on that interpretation. Applying principles of trust law, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 109 S.Ct. at 956.[3] PALICO presents two reasons why this court should apply an abuse of discretion standard.

First, PALICO attempts to distinguish this case from the one decided in *Firestone*. It argues that the plan administrator in *Firestone* denied benefits based on an interpretation of an ambiguous term defining the class of individuals eligible for benefits (*i.e.*, those who lost their jobs due to a "reduction in work force"). PALICO contends that this case, by contrast, presents the court with a denial of benefits to a single individual, not a class, based upon the application of unambiguous policy terms. In essence, the company attempts to distinguish the interpretation of a policy term from the application of the policy to a particular individual. The *de novo* standard, the argument concludes, should apply only to the interpretation of policy terms affecting a class of individuals.

The suggested distinction does not fit well in this case. Just as the dispute in *Firestone* turned on the interpretation of the phrase "reduction in work force," the dispute in this case turns largely on the interpretation of the phrase "intentionally self-inflicted injury." PALICO presents a definition of the term "intentionally" which would cover Mrs. Reinking's actions (because she acted "purposefully"), while the Reinkings offer another definition which would not cover her actions (because she could not exercise "rational" judgment). The choice between these interpretations determines whether Mrs. Reinking, and other potential beneficiaries in a similar position, are eligible for benefits under the policy. As the Supreme Court articulated in *Firestone*, the court choosing between these competing definitions owes no deference to either the plan administrator or the employee and should apply a *de novo* standard of review, unless the plan itself delegates to one of the parties the authority to interpret the policy terms, which in this instance, as discussed *supra*, the plan does not do.

However, this case does involve a factual question distinguishable from the issue presented in *Firestone*. The parties in *Firestone* did not contest the facts underlying the sale of the division; their dispute concerned only the application of the policy to those facts. In this case, however, the parties contest the degree of Mrs. Reinking's mental impairment. PALICO suggests that the court should defer to its factual determination that Mrs. Reinking's depression did not significantly impair her capacity to form intent at the time of her suicide attempt. Its medical expert supported this decision by testifying that she was capable of exercising rational judgment, so she was able to injure herself "intentionally," and in fact so did, under either of the definitions offered by the parties.

But that factual determination is not controlling because the standard announced in *Firestone* applies both to the interpretation

---

3. For a post-*Firestone* review of the law prior to *Firestone* and a discussion of the new standard, see *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1184–86 (4th Cir.1989) (concluding that there had been a delegation of discretionary authority and applying an abuse of discretion standard of review).

of policy terms and to factual determinations necessary for the administrator to "determine eligibility for benefits." 109 S.Ct. at 956. Courts will review both sets of questions *de novo* unless the policy delegates discretionary authority to one of the parties. In our view, nothing in the policy at issue in this case grants PALICO discretionary authority to find the facts necessary to make eligibility determinations. For us to grant the plan administrator such discretion would unnecessarily undermine the protection of the employee afforded by the ERISA statute. Of course, nothing "forecloses parties from agreeing upon a narrower standard of review," 109 S.Ct. at 956, but they have not done so in this case.

PALICO's second argument for an abuse of discretion standard of review is that it has the discretion to interpret the terms of the policy "in light of all the circumstances." [4] While no express delegation of authority exists, PALICO contends that it has the power under the policy to determine what information is necessary for the "determination of premium rates and the efficient administration of the policy." [5] That authority, it asserts, is similar to the authority found in *Boyd v. Trustees of United Mine Workers Health & Retirement Funds*, 873 F.2d 57 (4th Cir.1989) (decided after *Firestone*). In *Boyd*, the court found that the trustees' decision would be reviewed under the abuse of discretion standard where the plan gave the administrators "the power of 'full and final determination as to all issues concerning eligibility of benefits'" and the authority to

" 'promulgate rules and regulations to implement [the insurance plan.]'" *Id.* at 59.

PALICO's authority, however, is far more limited than the authority granted in *Boyd*. Here PALICO has the limited authority to ask for information whereas the trustees in *Boyd* could promulgate substantive rules concerning all aspects of the plan. [6] If anything, the grant of specific limited authority with no mention of a general power to interpret policy terms suggests an intention *not* to delegate such responsibility. Accordingly, we affirm the district court's decision to apply a *de novo* standard of review.

### III.

The insurance policy exempts PALICO from liability for *"intentionally* self-inflicted injury" (emphasis added). The trial court held that "[j]udicial decisions interpreting exclusions for intentional injuries indicate that the actor must have the requisite mental capacity to form an intent of inflicting injury." To the same effect, see *Insurance Co. of North America v. Aufenkamp*, 291 Md. 495, 435 A.2d 774, 779 (1981) (noting the "generally recognized principle, to which [Maryland case law] subscribes, that taking one's own life while insane undeniably is accomplished without intention."). *See generally* 1B, J. Appleman & J. Appleman, *Insurance Law and Practice*, §§ 452, 495 (1981). Insurance companies seeking to avoid all liability in this area can and do include provisions excluding coverage for suicide or self-inflicted injuries committed while "sane or insane." [7] PALICO concedes that the

---

**4.** As stated *supra,* with relation to our discussion of PALICO's attempts to distinguish *Firestone,* we cannot accept that view.

**5.** PALICO also has discretionary authority to deal with payments concerning overlapping coverage with other plans.

**6.** In those cases decided after *Firestone* in which courts have inferred discretionary authority from benefit plan documents and applied an abuse of discretion standard of review, the plans contained some explicit delegation of authority to the plan administrator even if such delegation was not explicitly stated to be discretionary. *See, e.g., De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1186–87 (4th Cir.1989) (plan gave the

administrator the power "[t]o determine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions...."); *id.* at 1187 n. 4 (citing cases).

**7.** Courts will often enforce such a clause regardless of the degree of insanity. *See, e.g., Aetna Life Ins. Co. v. McLaughlin,* 380 S.W.2d 101, 102 (Tex.1964). Some courts, however, are reluctant to enforce such exclusionary clauses. For example, in *Searle v. Allstate Life Ins. Co.,* 212 Cal.Rptr. 466, 473, 696 P.2d 1308 (1985), the court held that an exclusion for "suicide, whether sane or insane" did not apply if the insured did not understand the physical nature and consequences of the act. Such a severe impair-

Reinkings may recover benefits under their policy if she was "insane" at the time of her attempted suicide and thus unable to form the requisite mental intent.

Relying upon the expert medical testimony that depression had grossly impaired Mrs. Reinking's capacity for rational thought, the trial court concluded that "Mrs. Reinking was mentally incapable of forming an intent to injure herself." PALICO challenges that finding in this appeal, asserting that it is unsupported by the evidence in the record. The finding by the district court is a factual one, and this court may disturb it only if it is clearly erroneous. *See* Rule 52(a) of the Fed.R. Civ.P.; *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### IV.

An individual is relieved of responsibility for a given act if "his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist." *Mutual Life Ins. Co. v. Terry*, 82 U.S. 580, 591, 21 L.Ed. 236 (1873) (holding that insured did not "die by his own hand" where suicide was induced by an insane impulse). Maryland adopted a similar standard in *Knickerbocker Life Ins. Co. v. Peters*, 42

Md. 414 (1875).[8] While our society's understanding of mental illness and what may constitute an "insane impulse" has progressed substantially in the last century, courts still use the same basic formulation of the test as articulated above. *See, e.g., Insurance Company of North America v. Aufenkamp, supra*, 291 Md. at 504, 435 A.2d 774 (quoting *Knickerbocker*).

That definition suggests three categories of insanity.[9] The first involves a person who is delusional or who does not understand the physical consequences of an act. For example, had Mrs. Reinking imagined that she was drawing pictures with a pen instead of stabbing herself with a knife, she would not have intended to injure herself. The experts on both sides agreed, however, that she understood the physical nature of her act.

The second category consists of people who cannot appreciate the moral character of an act. Applying that definition may prove difficult in practice because rational people disagree over the moral nature of many actions.[10] We do not, however, have to address those problems here; the plaintiffs have not argued that Mrs. Reinking lacked the capacity to understand the moral character of her actions.

The third category involves an "insane" impulse that so overwhelms the will or rational thought that the individual is unable to resist the desire to commit suicide.

ment, the court held, would negate suicidal intent. In addition, some states have enacted by legislation statutory limitations with regard to such clauses. Maryland, for example, limits exclusions from life insurance policies for death by suicide, while sane or insane, to a period two years from the date of issuance of the policy. Art. 48A Md.Ann.Code § 410(a)(5) (1989).

8. In *Knickerbocker*, the insurance policy also excluded coverage where the insured "died by his own hand." In affirming a judgment ordering the insurance company to pay benefits in a case where the insured had committed suicide, the court noted that "[i]f a man's consciousness, reason and will are overpowered, and he is impelled to the act by an insane impulse which he cannot, or which the reason he has left does not enable him to resist, ... he does the act *involuntarily*, and it is impossible to call it 'his voluntary and wilful act.'" 42 Md. at 421.

9. The three categories are in line with the approach enunciated in *Cole v. Combined Ins. Co. of America*, 125 N.H. 395, 480 A.2d 178, 179 (1984), that there are "three basic alternative descriptions of the insane mind as lacking the capacity to appreciate physical consequences of the act, lacking the capacity to appreciate the moral character of the act, or lacking the capacity for choice to act or not."

10. As the court in *Cole* (*see* n. 9, *supra*) noted:
One judge or jury could decide suicide was morally acceptable in the circumstances and conclude that a decedent suffered from no incapacity if he believed it was right to kill himself. Another judge or jury could hold that suicide was wrong and conclude that a decedent who believed otherwise probably lacked capacity to appreciate this moral position.
480 A.2d at 180.

The party asserting such an incapacity must usually show that the individual lacked the ability to make a meaningful choice between committing and not committing suicide. *See Cole*, 480 A.2d at 179. The decision does not have to be impulsive in the sense of being sudden as long as the individual lacked the capacity for effective choice.

We recognize that applying that third definition can prove problematic. On the one hand, any person who actually attempts suicide may obviously be unable to overcome the desire to make the attempt. One could label that desire an "irresistible impulse" and hold that the person did not have the mental capacity to form intent. Under that view, virtually every person who attempted suicide would not have inflicted an "intentional" injury. On the other hand, any person attempting suicide who understands the physical consequences of the act may be acting rationally in some sense of the word. Whether or not we consider it a wise choice, the person has decided that he or she prefers not to bear the burden of continuing to live. Even individuals who do not wish to succeed, but hope to draw attention to their plight, could be described as committing a rational act. Under that view, virtually every person attempting suicide would have the mental capacity to form intent.[11]

To the extent that it is possible, we may avoid the necessity to choose between the two views outlined above by evaluating the individual's mental condition independent of his decision to attempt suicide.[12] If an affliction renders a person unable to resist an impulse to commit an act, then the resulting actions are "unintentional" regardless of whether a rational person would have chosen to commit the same act. In this case, experts on both sides were able to examine Mrs. Reinking and, looking backward, were able to evaluate her mental condition between the time of her miscarriage and her attempted suicide. The task of the district court is not to determine whether her decision to attempt suicide was rational, but to determine whether she was competent to make such a decision at that point in time.

## V.

■ The district court found that Mrs. Reinking fell into the third category of insanity at the time of her attempted suicide—that her mental depression overwhelmed her rational judgment and prevented her from resisting the impulse to end her life. PALICO argues that that finding was clearly erroneous because Mrs. Reinking "purposefully" sought to end her life. The company contends in essence that any person who commits an act understanding that it will end his life retains the necessary mental capacity to form intent.

The problem with PALICO's approach is that it fails to distinguish between the ability to choose the means to achieve a goal and the ability to assess the merits of the goal to be achieved. A person suffering from insanity may be able to act purposefully to attain an immediate goal. In this case, for example, Carol Reinking possessed the ability to formulate and execute a scheme to commit suicide. However, she did not necessarily have the ability to decide whether her chosen goal, suicide, was a good one.[13]

The record contains substantial evidence to support the district court's finding that Mrs. Reinking lacked the capacity to evaluate effectively her decision to commit suicide. The plaintiffs introduced expert medical testimony from three witnesses

11. For a discussion of the rationality of suicide, particularly in the context of euthanasia, see Smith, *All's Well That Ends Well: Toward a Policy of Assisted Rational Suicide or Merely Enlightened Self–Determination?*, 22 U.C. Davis L.Rev. 275 (1989).

12. In many instances (*e.g.*, where the attempt is successful), the medical expert cannot examine the individual directly and must infer his mental state from evidence gathered after the fact. In those cases, the decision to attempt suicide will play a much larger role in the expert's evaluation.

13. As another illustration, consider a psychotic who plans to assassinate a public figure. He may act with considerable purpose even though he is "insane" from a legal standpoint.

which we briefly summarize. Dr. Shaw testified that Mrs. Reinking was clinically depressed and not capable of applying rational thought to her suicide attempt.[14] He indicated that she was not in touch with reality at the time. Dr. Blumberg testified that Mrs. Reinking suffered "from a mental disorder, major depression, single episode, severe without psychotic features." He agreed that Mrs. Reinking was not capable of rational thought or formulating other options at the time of her suicide attempt. He pointed out that, although she knew what she was doing and could act purposefully to carry out a suicide plan, she was not capable of acting rationally. He played down the importance of the PCP use. Dr. Keller generally corroborated the two prior experts. He testified that Mrs. Reinking's judgment was grossly impaired from severe mental depression.

PALICO responded with testimony from Dr. Henderson. He testified that Mrs. Reinking was aware of her surroundings and capable of rational thought. He viewed her actions as a coherent, logical effort to carry out a premeditated suicide plan. He disagreed with the plaintiffs' experts over their characterization of her behavior as bizarre and illogical. To the extent that Dr. Henderson's testimony conflicted with the testimony introduced by the plaintiffs, the district court acted well within its discretion in discounting the defendant's evidence.

The district court credited the testimony of the plaintiffs' experts and found that Mrs. Reinking was not capable of rational thought and that her depression inhibited her ability to formulate options and made her believe that suicide was the only way to end her pain and suffering. We cannot say that the district court clearly erred in finding that the breakdown in Mrs. Reinking's mental processes was severe enough to render her actions unintentional.

In a closely related context, a California court has come to a similar conclusion. In *Burnight v. Industrial Accident Commission*, 181 Cal.App.2d 816, 5 Cal.Rptr. 786

(1960), the Court of Appeals of California interpreted a clause excluding "intentionally self-inflicted injuries" from coverage under the workers compensation statute. *Id.* 5 Cal.Rptr. at 790. The deceased employee, suffering severe depression partially due to stress on his job, went to a motel and cut his wrist. The court said that it was

> not persuaded that the mere fact that the employee's act of suicide was a volitional one in that he knew what he was doing when he committed it constitutes the act [as] one that is "intentionally self-inflicted" or one which should cause a denial of compensation. We think that the test is and should be, not did the employee know what he was doing, but was the compulsion or the impulse to commit suicide one which he could not resist.

5 Cal.Rptr. at 790 (citations omitted). Based on that reasoning, the court reversed a judgment against the claimant. We recognize that the court in *Burnight* addressed a workers' compensation claim, not a private insurance claim, but the legal issue presented there was virtually identical.

We therefore affirm the district court's finding that Mrs. Reinking's injuries were not "intentionally" self-inflicted.

### VI.

The ERISA statute states that in "any action under this subchapter ... the court in its discretion may allow a reasonable attorney's fee and cause of action to either party." 29 U.S.C. § 1132(g). The trial court applied the five-factor approach set forth in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980), and awarded attorneys' fees in the amount of $37,000. We review that decision for an abuse of discretion, if any. The five types of factors suggested in *Bowen* and examined by the court below were:

1. degree of opposing parties' culpability or bad faith;

---

**14.** Dr. Shaw also indicated that Mrs. Reinking's prolonged PCP usage could have had some effect, as evidenced in part by the unusually violent nature of her suicide attempt.

2. ability of opposing parties to satisfy an award of attorneys' fees;
3. whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
4. whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
5. the relative merits of the parties' positions.

*Bowen,* 624 F.2d at 1266.

PALICO argues on appeal that the district court improperly applied those factors. For example, the district court found that PALICO, while not acting in bad faith, failed to investigate the claim as warranted by the unique circumstances and held that the first factor weighed in favor of awarding fees. PALICO argues that it has a good faith argument that Mrs. Reinking's injuries were intentionally self-inflicted. The company asserts that it was at most negligent for not further investigating Mrs. Reinking's mental state, and that negligence alone does not constitute bad faith. We agree. Mere error, in and of itself, does not necessarily constitute bad faith. *See McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1572 (11th Cir.1985).

While not all of the five factors listed above may weigh in favor of granting attorney's fees, we find that a fee award is nevertheless appropriate. In exercising its discretion under the statute, the court may use the five factors as a guide, but it must also bear in mind the remedial purposes of ERISA to protect employee rights and to secure effective access to federal courts. We agree with the Ninth Circuit that, in order to effectuate the remedial purposes of ERISA, a prevailing individual beneficiary " 'should ordinarily recover attorney's fees unless special circumstances would render such an award unjust.' " *Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984) (quoting *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344,

1356 (8th Cir.1980) (quoting *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968))).

In this case, PALICO does not appear to have acted with malicious intent or bad faith in denying the Reinkings' claim on the grounds that it was an intentionally self-inflicted injury. The second factor, however, weighs in favor of awarding fees because PALICO could easily afford to satisfy an award while the fees would place a substantial hardship on the Reinkings. Failure to award fees in such a circumstance would significantly undermine the ability of potential beneficiaries to protect their rights in federal court. "Without counsel fees the grant of federal jurisdiction is but a gesture for few union members could avail themselves of it." *Smith,* 746 F.2d at 590 (quoting *Hall v. Cole,* 412 U.S. 1, 13, 93 S.Ct. 1943, 1950, 36 L.Ed.2d 702 (1973)).

The third factor, deterrence of others in similar circumstances, also weighs in favor of awarding fees. PALICO argues that the district court found that the court's interpretation of the policy would deter others, but not that the award of fees would itself constitute a deterrent. The company ignores simple economic incentives. The award of fees to a prevailing employee increases the expected cost to the plan administrator who rejects a claim on the basis of ambiguous terms in the policy. The administrator is more likely to accept reasonable interpretations offered by employees and thereby better protect employee rights. The district court properly weighed that factor on the side of awarding fees.

The district court also concluded that the Reinkings had conferred a benefit on other participants by clarifying the interpretation of the term "intentional" in the policy exclusion. PALICO argues that that fourth factor should not weigh in favor of a fee award because the benefit was only incidental. During cross examination at trial, Mr. Reinking agreed that he was suing only on behalf of himself and his wife. The most that can be said for that argument by PALICO is that it suggests the fourth factor should not weigh in favor of

a fee award.[15] It does not suggest a special circumstance weighing against an award. In addition, the standard PALICO proffers requires a subjective intent of altruism not necessary to further the purposes of ERISA. Encouraging suits which confer a benefit on a class of individuals furthers the protection of employee rights. Awarding attorney's fees in such suits would generally encourage employees to file them. While Mr. Reinking may have had sufficient motivation in this particular case, it is not necessary, and would become burdensome, to engage in an inquiry into the particular employee's subjective motivations in every case.[16]

Finally, the court below examined the merits of the position taken by PALICO. The court found that PALICO's arguments were reasonably supported by the testimony of its expert witness, Dr. Henderson, but that the company had denied the claim without the benefit of any examination into Mrs. Reinking's medical condition. PALICO did not obtain a medical opinion with regard to her mental condition for almost three years after the suicide attempt. Therefore, the district court concluded that the last of the five factors weighed in favor of an award. While we agree that PALICO has a reasonable argument, it is nonetheless true that the plaintiffs have prevailed on the merits. Thus, the fifth factor does not indicate any special circumstances weighing against a fee award.

The award of attorney's fees substantially alleviates the burden otherwise placed upon the Reinkings in protecting their rights in federal court. Nothing in this case indicates that the award works a substantial injustice on the defendant. We therefore hold that the district court did not abuse its discretion in awarding fees.

## VII.

■ In their complaint, the Reinkings seek extracontractual damages for emotional distress and trauma and punitive damages from the breach of duty by PALICO. The district court held that those damages were not recoverable under ERISA. On appeal, the Reinkings claim that they may recover damages for emotional distress under 29 U.S.C. § 1132(a)(1)(B).[17]

In *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that extracontractual damages are not recoverable under § 409(a). The Reinkings point out that the holding is limited to § 409(a) and does not explicitly preclude extracontractual or punitive damages under the provision under which they sue, § 502(a). In fact, the Supreme Court did not reach the issue of extracontractual damages with regard to any section other than § 409(a). *Id.* at 139 n. 5, 105 S.Ct. at 3088 n. 5. *See also Powell v. Chesapeake and Potomac Telephone Co. of Virginia*, 780 F.2d 419, 424 (4th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). However, PALICO persuasively points out the broader implications of *Russell.* As part of its reason for holding that extracontractual damages are not available under § 409(a), the Supreme Court relied on the lack of any provision for such damages under § 502(a).[18] "Significantly, the statutory provision explicitly authorizing a beneficiary to bring an action [§ 502(a)(1)(B) ] says nothing about the recovery of extra-contractual damages.... Thus, there really is nothing at all in the statutory text to support the conclusion

---

15. PALICO also appears to read more into Mr. Reinking's statement than is warranted. He agreed that he and his wife were suing only on behalf of themselves in the case at hand and that no one else would be showing up in the courtroom to assert any interest contrary to the position asserted in this case by PALICO. Such a statement is not inconsistent with a desire to help future potential beneficiaries who may be in similar circumstances.

16. The inquiry would quickly become meaningless as well. Any plaintiff aware of the subjective standard would merely have to state a desire to help others. It would make little sense to punish the Reinkings for their candor.

17. The Reinkings have not appealed from the denial of punitive damages.

18. The Reinkings are suing under § 502(a). 29 U.S.C. § 1132(a).

that such a delay gives rise to a private right of action for compensatory or punitive relief." 473 U.S. at 144, 105 S.Ct. at 3091. The Court went on to say that it is "reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA." 473 U.S. at 147, 105 S.Ct. at 3093.

In addition, this circuit noted in another case involving ERISA, namely *Powell*, 780 F.2d at 424, that relief such as "extracontractual or punitive" damages is "generally not available in an action by a beneficiary against a trustee for breach of trust." We find that extracontractual damages are not available in this action and thus affirm the district court denial of damages for emotional distress.

## VIII.

For the reasons stated above in this opinion, we hold that the district court properly applied the law and did not commit any clear error in its factual findings.

AFFIRMED.